UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A WHITE IPHONE 14 WITH TELEPHONE NUMBER (857) 397-7151 AND A RED IPHONE 12 WITH TELEPHONE NUMBER (929) 638-8842, SEIZED ON MARCH 22, 2024 AND LOCATED AT THE PORTSMOUTH POLICE DEPARTMENT IN PORTSMOUTH, NEW HAMPSHIRE | No. 1:24-mj-61-01/02-TSM |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO SEARCH AND SEIZE

I, David McGuckin, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA") having served in this capacity for approximately 18 years, both from August 2004 to April 2019, and from March 2021 to the present. I am currently assigned to the DEA's Manchester District Office, High Intensity Drug Task Force One in Bedford, New Hampshire, where my primary duties include investigating federal drug crimes. For approximately 23 months, from April 2019 to March 2021, I was employed as an Inspector with the United States Postal Inspection Service ("USPIS"). While employed with the USPIS, I was assigned to the Boston Division, Prohibitive Mail Team, where my primary duties included investigating federal crimes involving the U.S. Mail, such as federal drug crimes. I hold a Bachelor of Science degree from the University of New Hampshire in Durham, New Hampshire and a Master of Science in Education degree from Iona University in New Rochelle, New York.

2. Over the course of my law enforcement career, I have been trained in all major aspects of drug-related investigations. In 2004, I graduated from the DEA Training Academy in

1

Quantico, Virginia, where I received training in drug interdiction, drug identification, search warrants, undercover techniques, surveillance, debriefing informants, and other investigative procedures. Since 1998, I have received thousands of hours of online and in-person training, which have kept me up to date on laws, trends, and investigative procedures regarding federal drug crimes. In addition to attending trainings, I have had the opportunity to search, seize, and personally observe what I have recognized to be (and what was later confirmed by drug analysis to be) different drugs, such as fentanyl, methamphetamine, and cocaine. I have conducted or participated in surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of recorded communications related to drug trafficking. I also have assisted in multiple state and federal drug-related investigations. I have drafted drug-related search and arrest warrants, and I have participated in the execution of numerous search and arrest warrants in which drugs, drug proceeds, drug paraphernalia, and drug-related electronic data were found.

3. Through my training and experience, I have become familiar with the habits, methods, practices, and procedures commonly employed by individuals engaged in drug trafficking, including their use of cellular telephones, social media services, and messaging applications to communicate with each other during and in furtherance of drug-related crimes.

4. I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of a cellular telephone, which is described herein and in Attachment A, and the extraction from the cellular telephone of electronically stored information, which is described herein and in Attachment B.

5. The facts set forth in this affidavit come from my personal knowledge and observations based on my direct involvement in this investigation, my training and experience, and information relayed to me by others, including other members of law enforcement. This

affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6. The property to be searched consists of a cellular telephone

**Device 1** is a white iPhone 14 with white backing and clear case, with telephone number (857) 397-7151:

 

**Device 2** is a red iPhone 12 with red backing and blue case, assigned telephone number (929) 638-8842:

 

**Device 1** and **Device 2** are currently located at the Portsmouth Police Department in Portsmouth, New Hampshire, where both **Device 1** and **Device 2** are connected to continuous power sources and secured in a faraday bags in anticipation of law enforcement seeking this warrant. This warrant authorizes the forensic examination of **Device 1** and **Device 2** for the purpose of identifying electronically stored data described in Attachment B.

## PROBABLE CAUSE

7. Members of the DEA's Manchester District Office, together with state and local law enforcement in New Hampshire, have been investigating multiple suspected drug-related crimes involving Leuris GUERRERO-VALDEZ[1] and others known and unknown individuals, including, but not limited to, distribution of controlled substances, possession with intent to distribute controlled substances, unlawful use of a communications facility, and conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 841, 843, and 846.

8. Pursuant to this investigation, in May 2023, law enforcement debriefed a confidential source ("CS")[2] who reported that an individual known as "Carlos" was distributing fentanyl and methamphetamine in the New Hampshire seacoast area, personally transporting the narcotics from Lawrence, Massachusetts to Seabrook and Portsmouth, New Hampshire.

---

[1] During the course of this investigation, the principal target was identified by multiple names, initially Carlos GONZALEZ, then Francis MENDOZA-CRUZ and finally Leuris GUERRERO-VALDEZ. Subsequent to his arrest on March 22, 2024, with assistance from the Department of Homeland Security (HSI) Enforcement & Removal Operations, agents confirmed the individual's true identity as Leuris GUERRERO-VALDEZ.

[2] The CS has a history of drug use. The CS's criminal history includes arrests or convictions for, among other things, drug-related, vehicle-related, fraud-related and theft-related offenses. The CS is cooperating with law enforcement in exchange for monetary compensation. To date, the information provided by the CS has proven credible and reliable.

9. In June 2023, the CS introduced an undercover law enforcement officer (the "UC"). Between June and November 2023, the UC arranged approximately nine drug transactions with GUERRERO-VALDEZ through the **Device 2's** associated phone number, (929) 638-8842 ("the 8842 number"). During those nine transactions, the UC purchased approximately 672 grams of methamphetamine in Portsmouth and Seabrook, New Hampshire, which was tested and confirmed by the DEA Laboratory.

10. During one particular drug transaction on July 14, 2023, while the UC was with GUERRERO-VALDEZ, the DEA placed a "ghost" call to the 8842 number associated with **Device 2**. As they placed the call, the UC observed the GUERRERO-VALDEZ's phone ring and saw the last four digits of the incoming number – which matched the incoming DEA phone number.

11. On March 8, 2024, the UC completed an additional controlled purchase of approximately 56 grams of suspected methamphetamine from GUERRERO-VALDEZ in Seabrook, New Hampshire, arranged through the 8842 number associated with **Device 2**. The subsequent DEA lab report of the suspected methamphetamine from the controlled purchase resulted in a positive return for methamphetamine chloride.

12. On March 13, 2024, GUERRERO-VALDEZ was indicted in the District of New Hampshire and charged with four counts of Distribution of a Controlled Substance, in violation of Title 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C). As a result of the indictment, a federal arrest warrant was issued for GUERRERO-VALDEZ.

13. On March 22, 2024, the UC completed a controlled purchase of approximately 56 grams of suspected methamphetamine from GUERRERO-VALDEZ in Newington, New Hampshire, arranged through the 8842 number associated with **Device 2**. The controlled purchase

occurred in GUERRERO-VALDEZ'S car. The subsequent DEA lab report of the suspected methamphetamine from the controlled purchase is not yet complete, but a subsequent field test was presumptively positive for the presence of methamphetamine.

14. Following the UC purchase of suspected methamphetamine, and based on the pending federal arrest warrant, members of the New Hampshire State Police ("NHSP") Mobile Enforcement Team ("MET") conducted a traffic stop in Greenland, New Hampshire, where GUERRERO-VALDEZ was arrested without incident. Following the arrest, investigators recovered **Device 1** from GUERRERO-VALDEZ'S hands. In his sweatshirt pocket was the official authorized funds that the UC used to purchase the suspected methamphetamine from GUERRERO-VALDEZ.

15. On March 22, 2024, during a post-*Miranda* interview[3], GUERRERO-VALDEZ consented to a search of his residence and a second associated residence, located in Methuen and Lawrence, Massachusetts, respectively. The searches resulted in the seizure of approximately one kilogram of suspected fentanyl, 240 grams of suspected methamphetamine, 210 grams of suspected cocaine, 55 grams of suspected cocaine base, $7,875.00 U.S. Currency and a .22 caliber Taurus semi-automatic handgun. The subsequent DEA lab reports of the suspected fentanyl, suspected methamphetamine, suspected cocaine and suspected cocaine base from the two consent searches are not yet complete, but subsequent field tests were presumptively positive for the presence of fentanyl, methamphetamine, cocaine and cocaine base.

16. During the interview, investigators presented GUERRERO-VALDEZ with the items found during the search. GUERRERO-VALDEZ acknowledged ownership of the narcotics

---

[3] GUERRERO-VALDEZ does not speak English. A Spanish-speaking investigator served as a translator during the interview.

and the handgun. Additionally, GUERRERO-VALDEZ acknowledged selling narcotics to the undercover law enforcement officer on multiple occasions.

17. GUERRERO-VALDEZ also provided **Device 1's** telephone number as (857) 397-7151 ("the 7151 number"). Knowing that the undercover law enforcement officer communicated with GUERRERO-VALDEZ on the 8842 number, investigators asked GUERRERO-VALDEZ about a second cell phone. GUERRERO-VALDEZ admitted that he had another cell phone and confirmed that it's corresponding phone number was the 8842 number. GUERRERO-VALDEZ stated that he discarded the second cellular phone from his vehicle upon observing law enforcement prior to his arrest. When confronted law enforcement's lacked observation of items thrown from his vehicle, GUERRERO-VALDEZ acknowledged hiding it between the driver's seat and the center console of his vehicle during to the traffic stop. Investigators retrieved **Device 2** from the location described by GUERRERO-VALDEZ in his vehicle.

18. **Device 1** and **Device 2** are currently in storage at the Portsmouth Police Department. In my training and experience, I know that **Device 1** and **Device 2** are being stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into DEA's custody.

19. I know through my training and experience that drug traffickers commonly carry and use more than one cell phone to conduct their drug trafficking business. Specifically, I know that drug traffickers will commonly carry at least one phone to communicate with customers and at least one other phone to communicate with co-conspirators and suppliers. I know that drug traffickers will often insulate their customer phone from any other devices that they utilize, as the customer telephone is inherently the riskiest part of the operation. Law enforcement will likely interact with a drug customer who is in communication with this phone at some point. However,

7

if there is no contact between the customer telephone and the other telephones used by the drug trafficker, then it is more difficult for law enforcement to identify it and identify sources of supply and potential co-conspirators.

20. Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments.

21. Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items can be stored on cell phones.

22. Cellular telephones often contain evidence of drug crimes, such as internet searches for drug-related paraphernalia, addresses and/or telephone numbers of suppliers and customers, as well as incriminating communications via emails, text messages, and/or instant messages. Most cell phones are now capable of performing internet searches and also allow the user to send and receive emails and text messages. Based on my training and experience, I am aware that drug traffickers may use encrypted chat platforms, such as Whatsapp, Textnow, Signal, Facebook Messenger, and Instagram, to communicate with individuals in other countries (often countries that supply controlled substances to the United States) and with individuals who are cautious about law enforcement detection.

23. In addition, applications such as Venmo and Cash App allow people to conduct financial transfers quickly and easily using their cellular telephones, and drug customers may use these methods to pay their sources of supply for drugs.

24. As noted above, drug traffickers commonly communicate using multiple cellular telephones. The numbers assigned to and dialed by particular cellular telephones can themselves

be evidence of drug trafficking. Such numbers can confirm the identities of particular speakers and the occurrence of certain events.

25. Based on my training, experience, and information provided by other law enforcement officers, I am aware that many cellular telephones now function essentially as small computers. Such telephones, known as smartphones, have capabilities that include – in addition to those noted above – serving as a digital camera, portable media player, and GPS navigation device, and they allow for the storage of a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

26. In this case, GUERRERO-VALDEZ had both **Device 1** and **Device 2** with him when he completed the drug transaction with the UC on March 22, 2024. **Device 1** was found in his hands when he was removed from his vehicle, with the OAF in his sweatshirt front pocket, and **Device 2** was found hidden in his car. During a search of one of his residences, investigators found a large quantity of various narcotics. As drug traffickers commonly carry more than one phone to conduct their business, GUERRERO-VALDEZ had two phones with him, and GUERRERO-VALDEZ was engaged in drug trafficking, there is probable cause to believe that evidence of distribution of controlled substances, possession with intent to distribute controlled substances, unlawful use of a communications facility, and conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 841, 843, and 846 will be found on **Device 1** and **Device 2.**

## TECHNICAL TERMS

16. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However,

a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

        d.      *GPS*: A GPS navigation device uses the global positioning system to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.      *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards

or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

      f.    *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

17.    Based on my training, experience, and research, I know that **Device 1** and **Device 2** have capabilities that allow each to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and are capable of accessing the internet. In my training and experience, examining data stored on cellular telephones of this type can uncover, among other things, evidence that reveals or suggests who possessed or used **Device 1** and **Device 2**, who **Device 1** and **Device 2** communicated with about drug activity, the contents of communications about drug activity, and photographs of drugs and drug activity.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18.    Based on my training, experience, and research, I know that electronic devices such as cellular telephones can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on electronic devices. This information can sometimes be recovered with forensics tools.

19.    *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence

of the crimes described on the warrant, but also forensic evidence that establishes how the electronic device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **Device 1** and **Device 2** because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

    b.    Forensic evidence on an electronic device also can indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.    Further, in finding evidence of how an electronic device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Device 1** and **Device 2** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

21. *Manner of execution.* Because this warrant seeks permission to examine cellular telephones already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

22. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Device 1** and **Device 2** as described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/ David McGuckin
David McGuckin
Special Agent
Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **Apr 4, 2024**
Time: **10:35 AM**

Hon. Talesha L. Saint-Marc
United States Magistrate Judge

14

**ATTACHMENT A**

The property to be searched consists of two cellular telephones ("**Device 1**" and "**Device 2**") described and pictured below:

**Device 1** is a white iPhone 14 with white backing and clear case, with telephone number (857) 397-7151:

 

**Device 2** is a red iPhone 12 with red backing and blue case, with telephone number (929) 638-8842:

 

**Device 1** and **Device 2** are currently located at the Portsmouth Police Department in Portsmouth, New Hampshire, where both are connected to continuous power sources and secured in a faraday bags in anticipation of law enforcement seeking this warrant. This warrant authorizes the forensic examination of **Device 1** and **Device 2** for the purpose of identifying electronically stored data described in Attachment B.

## ATTACHMENT B

The items to be seized from **Device 1** and **Device 2** described in Attachment A are records and information that relate to violations of Title 21, United States Code, Sections 841, 843, and 846 (distribution of controlled substances, possession with intent to distribute controlled substances, unlawful use of a communications facility, and conspiracy to distribute and to possess with intent to distribute controlled substances) that involve Leuris GUERRERO-VALDEZ and other known and unknown individuals, from the time period of May 2022 through the present including:

a.  Records and information related to drug trafficking, including address books, calendars, schedules, notes, ledgers, seller lists, buyer lists, sources of supply, and any identifying information for sellers, buyers, or sources of supply;

b.  Records and information related to types, amounts, and prices of drugs trafficked as well as dates, places, and amounts for specific drug transactions;

c.  Records and information of any travel related to drug trafficking;

d.  Records and information of all calls, emails, texts, chats, messages, and any other communications on **Device 1** and **Device 2** related to drug trafficking;

e.  Records and information of all correspondence and communications on any mobile application installed on **Device 1** and **Device 2** that are related to drug trafficking;

f.  Records and information indicating how and when **Device 1** and **Device 2** were accessed or used, in order to determine the chronological context of account access, events relating to the crimes under investigation, and the user of **Device 1** and **Device 2**;

g.  Records and information indicating the state of mind of the user of **Device 1** and **Device 2** as it relates to the crimes under investigation;

    h. Records and information indicating the financial means of purchasing drugs and the distribution and location of any drug proceeds;

    i. Pictures or videos of drugs, drug paraphernalia, drug proceeds, or drug associates; and

    j. Any hardware, software, and data on **Device 1** and **Device 2** that constitute instrumentalities of the crimes under investigation or evidence of violations of Title 21, United States Code, Sections 841, 843, and 846 (distribution of controlled substances, possession with intent to distribute controlled substances, unlawful use of a communications facility, and conspiracy to distribute and to possess with intent to distribute controlled substances).

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.